Opinion by Judge HUG; Dissent by Judge KLEINFELD.
OPINION
HUG, Circuit Judge:
The question presented is whether the district court abused its discretion in approving the parties’ $9.5 million settlement agreement as “fair, reasonable, and adequate,” either because a Facebook employee sits on the board of the organization distributing cy pres funds or because the settlement amount was too low. We hold that it did not.
I
Facebook is an online social network where members develop personalized web profiles to interact and share information with other members. The type of information members share varies considerably, and it can include news headlines, photographs, videos, personal stories, and activity updates. Members generally publish information they want to share to their personal profile, and the information is thereby broadcasted to the members’ online “friends” (i.e., other members in their online network).
In November of 2007, Facebook launched a new program called “Beacon.” Facebook described the purpose of the Beacon program as allowing its members to share with friends information about what they do elsewhere on the Internet. The program operated by updating a member’s personal profile to reflect certain actions the member had taken on websites belonging to companies that had contracted with Facebook to participate in the Beacon program. Thus, for example, if a member rented a movie through the participating website Blockbuster.com, Blockbuster would transmit information about the rental to Facebook, and Face-book in turn would broadcast that information to everyone in the member’s online network by publishing to his or her personal profile.
Although Facebook initially designed the Beacon program to give members opportunities to prevent the broadcast of any private information, it never required members’ affirmative consent. As a result, many members complained that Beacon was causing publication of otherwise private information about their outside web activities to their personal profiles without their knowledge or approval. Facebook responded to these complaints (and accompanying negative media coverage) first by releasing a privacy control intended to allow its members to opt out of the Beacon program fully, and then ultimately by discontinuing operation of the program altogether.
Unsatisfied with these responses, a group of nineteen plaintiffs filed a putative class action in federal district court against Facebook and a number of other entities that operated websites participating in the Beacon program. The class-action complaint alleged that the defendants had violated various state and federal privacy statutes.[1] Each of the plaintiffs’ claims *817 centered on the general allegation that Beacon participants had violated Facebook members’ privacy rights by gathering and publicly disseminating information about their online activities without permission. The plaintiffs sought damages and a variety of equitable remedies for the alleged privacy violations.
Facebook denied liability and filed a motion to dismiss the plaintiffs’ claims. Before the district court ruled on- Face-book’s motion, the parties elected to attempt settling their case through private mediation. The parties’ initial settlement talks reached an impasse over whether Facebook should terminate the Beacon program permanently, but after two mediation sessions and several months of negotiations, Facebook and the plaintiffs arrived at a settlement agreement. In September of 2009, plaintiff Sean Lane submitted the parties’ finalized settlement agreement to the district court for preliminary approval.
The terms of the settlement agreement provided that Facebook would permanently terminate the Beacon program and pay a total of $9.5 million in exchange for a release of all the plaintiffs’ class claims. Of the $9.5 million pay-out, approximately $3 million would be used to pay attorneys’ fees, administrative costs, and incentive payments to the class representatives. Facebook would use the remaining $6.5 million or so in settlement funds to set up a new charity organization called the Digital Trust Foundation (“DTF”). The stated purpose of DTF would be to “fund and sponsor programs designed to educate users, regulators!,] and enterprises regarding critical issues relating to protection of identity and personal information online through user control, and the protection of users from online threats.” The parties’ respective counsel arrived at the decision to distribute settlement funds through a new grant-making organization, rather than simply give the funds to an existing organization, at the suggestion of the private mediator overseeing their negotiations. Neither Facebook’s nor the plaintiffs’ class counsel was comfortable with selecting in advance any particular non-profit or non-profits to receive the entirety of the settlement fund, so they acceded to the mediator’s suggestion that Facebook set up a new entity whose sole purpose was to designate fund recipients consistent with DTF’s mission to promote the interests of online privacy and security.
According to DTF’s Articles of Incorporation, DTF would be run by a three-member board of directors. The initial three directors were Larry Magrid, a member of the federal government’s Online Safety and Technology Working Group and several other online safety organizations; Chris Hoofnagle, director of the Information Privacy Programs at the Berkeley Center for Law and Technology and former director for an office of the Electronic Privacy Information Center; and most relevant here, Timothy Sparapani, Facebook’s Director of Public Policy and former counsel for the American Civil Liberties Union. The Articles of Incorporation further provided that all of DTF’s funding decisions had to be supported by at least two members of the three-member board of directors but that the plan for succession of directors required unanimous approval. Finally, the Articles of Incorporation provided that DTF would be strictly a grant-making organization and could not engage in lobbying or litigation.
The settlement agreement also provided for the creation of a Board of Legal Advisors within DTF, which would consist of *818 counsel for both the plaintiff class and Facebook. The purpose of the Board of Legal Advisors would be to advise and monitor DTF to ensure that it acted consistently with its mission as articulated in the settlement agreement.
After a hearing, the district court certified the plaintiff class for settlement purposes and preliminarily approved the parties’ proposed settlement. The settlement class consisted of all Facebook members who had visited the website of a Beacon participant that transmitted information about the members’ activity to Facebook during the relevant period. The district court ordered Facebook to identify all class members and to send the class notification of the settlement. Following that order, Facebook identified 3,663,651 class members, to whom it provided notice of the settlement in several ways. The principal method was to send an e-mail to the class members. Facebook also posted a notice of the settlement in the “Updates” section of members’ personal Facebook accounts and published a separate notice in the national edition of the newspaper USA Today. All forms of notice directed class members to a website and toll-free number that contained information about the settlement.
Also pursuant to the district court’s order, notice to class members informed them of their right to opt out of the lawsuit and settlement, and to file any written comments or objections with the district court before final approval. At the conclusion of the notice period, 108 class members had opted out of the settlement, and four had filed written objections. The four class members who decided to remain in the lawsuit but file objections to the settlement were Ginger McCall, Megan Marek, Benjamin Trotter, and Patricia Burleson (collectively “Objectors”).
Following a final settlement approval hearing in which the district court heard from both the parties and Objectors, the district court entered an order certifying the settlement class and approving the class settlement. The district court dismissed the plaintiffs’ class action consistent with the settlement agreement, and it maintained jurisdiction over implementation of the settlement. The district court also awarded class counsel attorneys’ fees in a separate order. The amount of the attorneys’ fees was calculated at $2,322,763 under the “lodestar” method, meaning that the court multiplied the number of hours class counsel reasonably spent on the case by a reasonable hourly rate. That amount was combined with costs for a total attorneys’ fees award of $2,364,973, which represented less than one-third of the full $9.5 million settlement amount.
Objectors now appeal, contending that the district court abused its discretion in approving the parties’ settlement. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.
II
A district court’s approval of a class-action settlement must be accompanied by a finding that the settlement is “fair, reasonable, and adequate.” Fed. R.Civ.P. 23(e). Appellate review of the district court’s fairness determination is “extremely limited,” and we will set aside that determination only upon a “strong showing that the district court’s decision was a clear abuse of discretion.” See Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026-27 (9th Cir.1998) (holding that district court should have broad discretion because it “is exposed to the litigants, and their strategies, positions and proof’) (internal quotations omitted).
Both the district court and this court must evaluate the fairness of a set *819 tlement as a whole, rather than assessing its individual components. See id. at 1026. As our precedents have made clear, the question whether a settlement is fundamentally fair within the meaning of Rule 23(e) is different from the question whether the settlement is perfect in the estimation of the reviewing court. See id. at 1027. Although Rule 23 imposes strict procedural requirements on the approval of a class settlement, a district court’s only role in reviewing the substance of that settlément is to ensure that it is “fair, adequate, and free from collusion.” See id.
A number of factors guide the district court in making that determination, including:
the strength of the plaintiffs’ case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.
Id. at 1026 (hereinafter the “Hanlon factors”). Additionally, when (as here) the settlement takes place before formal class certification, settlement approval requires a “higher standard of fairness.” See id. The reason for more exacting review of class settlements reached before formal class certification is to ensure that class representatives and their counsel do not secure a disproportionate benefit “at the expense of the unnamed plaintiffs who class counsel had a duty to represent.” See id. at 1027; see also In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 787 (3d Cir.1995) (explaining that “[w]ith less information about the class” at the early stage before formal class certification, the court “cannot as effectively monitor for collusion, individual settlements, buy-offs (where some individuals use the class action device to benefit themselves at the expense of absentees), and other abuses”). Accordingly, when reviewing a district court’s approval of a class settlement reached before formal class certification, we will not affirm if it appears that the district court did not evaluate the settlement sufficiently to account for the possibility that class representatives and their counsel have sacrificed the interests of absent class members for their own benefit.
The settlement in this case provides for a cy pres remedy. A cy pres remedy, sometimes called “fluid recovery,” Mirfasihi v. Fleet Mortg. Corp., 356 F.3d 781, 784 (7th Cir.2004), is a settlement structure wherein class members receive an indirect benefit (usually through defendant donations to a third party) rather than a direct monetary payment. As we recently recognized, the “cy pres doctrine allows a court to distribute unclaimed or non-distributable portions of a class action settlement fund to the ‘next best’ class of beneficiaries.” Nachshin v. AOL, LLC, 663 F.3d 1034, 1036 (9th Cir.2011). For purposes of the cy pres doctrine, a class-action settlement fund is “non-distributable” when “the proof of individual claims would be burdensome or distribution of damages costly.” See id. at 1038 (quoting Six Mexican Workers v. Ariz. Citrus Growers, 904 F.2d 1301, 1305 (9th Cir.1990)). The district court’s review of a class-action settlement that calls for a cy pres remedy is not substantively different from that of any other class-action settlement except that the court should not find the settlement fair, adequate, and reasonable unless the cy pres remedy “aecount[s] for the nature of the plaintiffs’ lawsuit, the objectives of the underlying statutes, and *820 the interests of the silent class members .... ” Nachshin, 663 F.3d at 1036.
Ill
Objectors challenge the district court’s conclusion that the settlement in this case was “fair, reasonable, and adequate” within the meaning of Rule 23(e). The district court arrived at that determination after considering Objectors’ written statements and holding a fairness hearing where it provided Objectors an opportunity to be heard. The district court accompanied its fairness conclusion with findings of fact, which included the court’s application of the eight Hanlon factors to the parties’ settlement agreement.
Weighing those factors, the district court found that the settlement should be approved on the basis of the following: (1) reliance on novel legal theories and unclear factual issues undermined the strength of the plaintiffs’ case; (2) the complex nature of the plaintiffs’ claims increased the risk and expense of further litigation; (3) the class action could be decertified at any time, which “generally weighs in favor of approving a settlement”; (4) “[i]n light of [the] litigation risks and in the context of settlement claims involving infringment of consumers’ privacy rights,” the class’s $9.5 million recovery was “substantial” and “directed toward a purpose closely related to Class Members’ interests in this litigation”; (5) the parties had engaged in significant investigation and informal discovery and research, which in addition to information about Beacon that was already publicly known enabled the plaintiff class to “make an informed decision with respect to settlement, even though formal discovery” had not yet been completed; (6) the settlement was “only achieved after intense and protracted arm’s-length negotiations conducted in good faith and free from collusion,” and that class counsel had “reasonably concluded that the immediate benefits represented by the Settlement outweighed the possibility — perhaps remote — of obtaining a better result at trial”; (7) no government agencies voiced objections or otherwise announced actions arising out of Facebook’s Beacon program; and (8) only four class members objected and “slightly more than 100” from a class of over 3.6 million opted out of the settlement.
Objectors raise two issues in opposition to the district court’s fairness findings. The first relates to the settlement agreement’s provision for a cy pres remedy. The second relates to the overall amount of the settlement. Objectors also raise the ancillary argument that notice to class members concerning the settlement was inadequate. We address each of these issues in turn.
1
Objectors’ first and strongest objection to the settlement goes to the structure of DTF, the organization that would distribute cy pres funds under the settlement agreement. Objectors contend that the presence of Tim Sparapani, Facebook’s Director of Public Policy, on DTF’s board of directors creates an unacceptable conflict of interest that will prevent DTF from acting in the interests of the class. Citing Six Mexican Workers, Objectors claim that the settling parties’ decision to disburse settlement funds through an organization with such structural conflicts does not provide the “next best distribution” of those funds and thus is categorically an improper use of the cy pres remedy.
We disagree. Objectors’ argument misunderstands the cy pres doctrine and the principle from our case law that a cy pres remedy must provide the “next best distribution” absent a direct monetary payment to absent class members. We do *821 not require as part of that doctrine that settling parties select a cy pres recipient that the court or class members would find ideal. On the contrary, such an intrusion into the private parties’ negotiations would be improper and disruptive to the settlement process. See Hanlon, 150 F.3d at 1027. The statement in Six Mexican Workers and elsewhere in our case law that a cy pres remedy must be the “next best distribution” of settlement funds means only that a district court should not approve a cy pres distribution unless it bears a substantial nexus to the interests of the class members — that, as we stated in Nachshin, the cy pres remedy “must account for the nature of the plaintiffs’ lawsuit, the objectives of the underlying statutes, and the interests of the silent class members.... ” 663 F.3d at 1036.[2]
The cy pres remedy in this case properly accounts for the factors outlined in Nachshin. Objectors concede that direct monetary payments to the class of remaining settlement funds would be infeasible given that each class member’s direct recovery would be de minimis. Objectors also do not dispute that DTF’s distribution of settlement funds to entities that promote the causes of online privacy and security will benefit absent class members and further the purposes of the privacy statutes that form the basis for the class-plaintiffs’ lawsuit. Unlike the cy pres remedies we disapproved in Nachshin and Six Mexican Workers, there is no issue in this case about whether the connection between the cy pres recipients and the absent class members is too tenuous, either because the cy pres entities’ missions are unrelated to the class’s interests or because their geographic scope is too limited. See Six Mexican Workers, 904 F.2d at 1308; Nachshin, 663 F.3d at 1040. The cy pres remedy the settling parties here have devised, bears a direct and substantial nexus to the interests of absent class members and thus properly provides for the “next best distribution” to the class.
We find no substance in Objectors’ claim that the presence of a Facebook employee on DTF’s board of directors categorically precludes DTF from serving as the entity that will distribute cy pres funds. As the “offspring of compromise,” Hanlon, 150 F.3d at 1027, settlement agreements will necessarily reflect the interests of both parties to the settlement, including those of the defendant. Defendants often insist on certain concessions in exchange for monetary payments or other demands plaintiffs make, and defendants can certainly be expected to structure a settlement in a way that does the least harm to their interests. Here, in exchange for its promise to pay the plaintiff class approximately $9.5 million, Facebook insisted on preserving its role in the process of selecting the organizations that would receive a share of that substantial settlement fund by providing that one of its representatives would sit on DTF’s initial board of directors, and the plaintiffs readily agreed to this condition. That Facebook retained and will use its say in how cy pres funds will be distributed so as to ensure that the funds will not be used in a way that harms Facebook is the unremarkable result of the parties’ give-and-take negotiations,[3] and the district court *822 properly declined to undermine those negotiations by second-guessing the parties’ decision as part of its fairness review over the settlement agreement.
We also reject Objectors’ claim that the settlement agreement’s cy pres structure is impermissible because the parties elected to create a new grant-making entity, DTF, rather than give cy pres funds to an already-existing online privacy organization. Again citing Six Mexican Workers, Objectors argue that DTF has “no substantial record of service” and is therefore inherently disfavored as a cy pres recipient. But we have never held that cy pres funds must go to extant charities in order to survive fairness review, and a settlement agreement that provides for the formation of a new grant-making organization is not subject to a more stringent fairness standard. The reason we found it relevant in Six Mexican Workers that the charity organization designated to receive cy pres funds had no “substantial record of service” was that there was no way of knowing whether the organization would use the funds to the benefit of class members. See Six Mexican Workers, 904 F.2d at 1308: Here, there is no such worry, because the settlement agreement and DTF’s Articles of Incorporation tell us exactly how funds will be used — to “fund and sponsor programs designed to educate users, regulators^] and enterprises regarding critical issues relating to protection of identity and personal information online through user control, and the protection of users from online threats.”[4] As we have explained, that mission statement provides the requisite nexus between the cy pres remedy and the interests furthered by the plaintiffs’ lawsuit consistent with the principles we announced in Nachshin.
Objectors’ contention that the settling parties were prohibited from creating DTF to disburse cy pres funds is without merit, and the district court did not abuse its discretion in so concluding.
2
Objectors’ second argument on appeal is that the district court did not sufficiently evaluate the plaintiffs’ claims and compare the value of those claims with the class’s $9.5 million recovery in the settlement agreement. Objectors contend that the value of the plaintiffs’ claims was in fact greater than the $9.5 million the plaintiffs settled for, in large part because some unidentified number of the class members may have a claim under the Video Privacy Protection Act (“VPPA”). The VPPA prohibits any “video tape service provider” from disclosing “personally identifiable information” about one of its consumers, and it provides for liquidated damages in the amount of $2,500 for violation of its provisions. 18 U.S.C. §§ 2710(b) and 2710(c)(2). Objectors contend that the district court was not sufficiently mindful of the possibility that the class’s VPPA claims would yield a high recovery at trial, and that the court would not have approved a settlement of $9.5 million if it had paid the proper attention to that possibility.
*823 As an initial matter, we reject Objectors’ argument insofar as it stands for the proposition that the district court was required to find a specific monetary value corresponding to each of the plaintiff class’s statutory claims and compare the value of those claims to the proffered settlement award. While a district court must of course assess the plaintiffs’ claims in determining the strength of their case relative to the risks of continued litigation, see Hanlon, 150 F.3d at 1026, it need not include in its approval order a specific finding of fact as to the potential recovery for each of the plaintiffs’ causes of action. Not only would such a requirement be onerous, it would often be impossible— statutory or liquidated damages aside, the amount of damages a given plaintiff (or class of plaintiffs) has suffered is a question of fact that must be proved at trial. Even as to statutory damages, questions of fact pertaining to which class members have claims under the various causes of action would affect the amount of recovery at trial, thus making any prediction about that recovery speculative and contingent.
Relatedly, the district court was not required to include among its findings specific commentary on each of the plaintiffs’ five statutory claims. All of the plaintiffs’ claims arise under similar privacy statutes, and as Facebook correctly points out, the plaintiffs’ likelihood of success with regard to each of those claims depends on the same basic legal theories and factual issues. The district court acted properly in evaluating the strength of the plaintiffs’ case in its entirety rather than on a claim-by-claim basis. See Hanlon, 150 F.3d at 1026.
Moreover, the record contradicts Objectors’ general argument that the district court did not meaningfully account for the potential value of the plaintiffs’ claims, including any claims under the VPPA. Both before and after the final settlement approval hearing, the district court specifically addressed the possibility that the presence of VPPA claims among some class members might affect the class settlement. In its order preliminarily approving the settlement, the district court notified the parties that “final approval will require a sufficient showing that terms of the settlement are reasonable, specifically in light of the claims under the VPPA, and the apparent availability of statutory penalties thereunder” (emphasis added). Following the district court’s instructions, the parties did address the VPPA issue in their briefing and arguments at the final approval hearing. The district court also heard from Objectors at that hearing, who again argued that the settlement was too low in light of the possibility of recovery under the VPPA.
The district court rejected that argument. It first observed that Objectors had not “brought to the Court’s attention any cases in which plaintiffs have been awarded multiple liquidated damages,” which if available would likely increase the class’s potential recovery under the VPPA substantially (even if only a small number of class members had VPPA claims). The district court further noted that bringing the VPPA claims to trial would involve significant risk for the class given that the plaintiffs’ claims relied on “novel legal theories” and “vigorously disputed” factual issues concerning the Beacon program. And although the district court did not mention it in its approval order, the parties had presented evidence to the court that Blockbuster, one of the only defendants that might qualify as a “video tape service provider” and therefore be subject to liability under the VPPA, was on the verge of bankruptcy, likely making any substantial damages against it annihilative. Based on its consideration of these factors, *824 the district court concluded that the “$9.5 million offered in settlement is substantial.”
That conclusion was not an abuse of the district court’s broad discretion. A $9.5 million class recovery would be substantial under most circumstances, and we see nothing about this particular settlement that undermines the district court’s conclusion that it was substantial in this case. Objectors are no doubt correct that the VPPA claims of some class members might prove valuable if successful at trial, but that does not cast doubt on the district court’s conclusion as to the fairness and adequacy of the overall settlement amount to the class as a whole. It is an inherent feature of the class-action device that individual class members will often claim differing amounts of damages — that is why due process requires that individual members of a class certified under Rule 23(b)(3) be given an opportunity to opt out of the settlement class to pursue their claims separately, as were the class members in this case. See Hanlon, 150 F.3d at 1024. But a class-action settlement necessarily reflects the parties’ pre-trial assessment as to the potential recovery of the entire class, with all of its class members’ varying claims. So even if some of the class members in this ease would have successful claims for $2,500 in statutory damages under the VPPA, those individuals represent, to use the candid phrasing of Objectors, “only a fraction of the 3.6 million-person class.” Their presence does not in itself render the settlement unfair or the $9.5 million recovery among all class members too low.[5]
Objectors rely significantly on Molski v. Gleich, 318 F.3d 937, 949 (9th Cir.2003) overruled, on other grounds by Dukes v. Wal-Mart Stores, Inc., 603 F.3d 571 (9th Cir.2010), in claiming that the cy pres remedy here “did not adequately protect the interests of the class,” but that case does not support Objectors’ argument. Molski involved a settlement that required the defendant to pay $195,000 in cy pres funds in exchange for a release of all the disability-related claims of a large class. 318 F.3d at 943-44. The district court in Molski had certified a mandatory settlement class under Rule 23(b)(2) without providing class members an opportunity to opt out of the settlement. Id. at 947. In addition to holding that the inability to opt out of the settlement violated class members’ due process rights, we held that “use of the cy pres award was inappropriate” under the circumstances because the parties had not made any showing that direct distribution of settlement funds to the class would be burdensome or costly. Id. at 954-55. We also found “troubling” that the class’s recovery under the settlement was so low relative to the high number of potential class members. See id.
Unlike the $195,000 cy pres fund in Molski, the settlement in this case provides for a substantial $9.5 million pay-out by Face-book for the benefit of the class and thus does not present a situation in which class representatives and counsel accepted their respective fees as a quid pro quo for quietly going away while the class receives va *825 tually nothing. See id. at 953-54. Also fundamentally different is that class members here received notice and were given the opportunity to opt out of the settlement. And, most essentially, there is no dispute that it would be “burdensome” and inefficient to pay the $6.5 million in cy pres funds that remain after costs directly to the class because each class member’s recovery under a direct distribution would be de minimis. See id. at 955. These features distinguish the present case from Molski and help to account for why the latter was one of the “rare” cases where we have intruded into the discretion of the district court by setting aside its determination that a settlement agreement is fundamentally fair. See Staton v. Boeing Co., 327 F.3d 938, 960-61 (9th Cir.2003).
The record here convincingly establishes that the district court accounted for the potential value of the VPPA claims of some class members, and the district court’s review of the circumstances surrounding the settlement was sufficiently comprehensive to ensure that class representatives and their counsel did not throw absent class members under the proverbial bus to secure a disproportionate benefit for themselves. See Hanlon, 150 F.3d at 1027. That review was accordingly compliant with this circuit’s requirement that the district court apply heightened review to a class-action settlement reached before formal certification. See id. at 1026. This is particularly manifest in that the district court’s detailed approval order included the specific factual finding that the settlement agreement “was only achieved after intense and protracted arm’s-length negotiations conducted in good faith and free from collusion.” Objectors have not made any showing, let alone a “strong” one, that this or any of the district court’s other findings was erroneous or amounted to a “clear abuse of discretion.” See id. at 1027.
Finally, the litigants devote several pages of briefing to a dispute over whether the settlement agreement’s provision mandating the permanent termination of the Beacon program provided any meaningful relief to the plaintiff class. Specifically, Objectors argue that Face-book’s promise to terminate Beacon is “illusory” because the original program was non-operational at the time of the settlement agreement and thus already “effectively terminated.” In light of our holding affirming the district court’s conclusion that the $9.5 settlement award substantially furthers the interests of the class, Objectors’ argument that Facebook’s promise to terminate Beacon provides no meaningful relief is of little moment, and in any event we find that it is without merit. Even assuming Objectors’ premise that Beacon was already effectively terminated, absent a judicially-enforeeable agreement, Facebook would be free to revive the program whenever it wanted. It is thus false to-, say that Facebook’s promise never to do so was illusory.
We affirm the district court’s holding that the settlement was fundamentally fair.
IV
Objectors argue additionally that the notice provided to class members during the opt-out period was insufficient because it did not describe the value of the plaintiffs’ statutory claims and “did not accurately describe what the class members would receive in exchange for the release” of those claims. Objectors argue in particular that the notice should have included a description of the VPPA statute, that it should have alerted class members that a Facebook employee would be on the board of the organization distributing cy pres funds, and that its reference to Facebook’s *826 promise to terminate Beacon was misleading because Beacon was already dormant.
We disagree. Notice provided pursuant to Rule 23(e) must “generally describe! ] the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.” Rodriguez v. West Publ’g Corp., 563 F.3d 948, 962 (9th Cir. 2009) (internal quotations omitted). That standard does not require detailed analysis of the statutes or causes of action forming the basis for the plaintiff class’s claims, and it does not require an estimate of the potential value of those claims. See id. (notice need not include “expected value of fully litigating the case”). Nor is there any particular requirement that notice in a class-action settlement involving a cy pres remedy name the individuals sitting on the cy pres recipient’s board of directors, even if one of those individuals has some association with the defendants in the case. Finally, for the same reasons we reject Objectors’ argument that Facebook’s promise to terminate Beacon was illusory, there was nothing misleading about referencing that promise in the class notice.
We agree with the district court that the notice in this case adequately apprised class members of all material elements of the settlement agreement and therefore complied with the requirements of Rule 23(e).
y
Ultimately, we find little in Objectors’ opposition to the settlement agreement beyond general dissatisfaction with the outcome. That dissatisfaction may very well be legitimate insofar as Objectors would have acted differently had they assumed the role of class representatives. But while Objectors may vigorously disagree with the class representatives’ decision not to hold out for more than $9.5 million or insist on a particular recipient of cy pres funds, that disagreement does not require a reviewing court to undo the settling parties’ private agreement. The district court properly limited its substantive review of that agreement as necessary to determine that it was “fair, adequate, and free from collusion.” See id.
AFFIRMED.

. Specifically, the plaintiffs alleged violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 (1986); the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (1986); the Video Privacy Protection Act, 18 U.S.C. § 2710 (1988); California’s Consumer Legal Remedies Act, Cal. Civ.Code § 1750; *817 and California’s Computer Crime Law, Cal. Pen.Code § 502.

. Our decision in Nachshin was not published at the time of argument in this case, but the principles we announced there were well established. We discuss Nachshin here because it provides a helpful summary of existing case law on the cy pres doctrine.

. Objectors argue that Facebook’s desire to protect its interest in the cy pres distribution process is tantamount to Facebook preserving its right to cause harm to the class. But Objectors' argument assumes a false dichotomy. It is perfectly consistent to say that DTF *822 can be structured both to ensure Facebook's interests are not harmed and to promote the plaintiffs’ general interests in the causes of online privacy and security.

. Objectors suggest that there is no assurance that DTF would perform in accordance with the strictures of its charter document, but that is unsupported speculation. There is no reason to suppose that both the Board of Legal Advisors (consisting of both the settling parties' counsel) and the district court (which retained jurisdiction over implementation of the settlement) would abdicate their responsibility to ensure that DTF performs according to the settlement agreement.

. Although a settlement is not categorically unfair for certain class members simply because they might recover higher damages than other class members were they to prosecute their claims individually, significant variation in claimed damages among class members is relevant to the Rule 23(b)(3) "predominance” analysis during class certification. See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 624-25, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). However, Objectors do not challenge the district court's class certification or its decision to include individuals with VPPA claims in the settlement class, so we express no opinion on that issue here.