Filed 12/4/23  Mendocino Farms Wage and Hour Cases CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| MENDOCINO FARMS WAGE AND HOUR CASES. | C096869 |
| | (JCCP No. 5153) |
| | (Sacramento Super. Ct. No. 34-2020-00277871; Los Angeles Super. Ct. Nos. 20STCV15652, 20STCV27610, 20STCV34641) |

The appeal in this coordinated proceeding arises from an order and judgment granting approval of a class action settlement reached between plaintiffs Sean Lalor (Lalor), Yaneth Elias (Elias), et al. (collectively, plaintiffs) and defendant Mendocino Farms, LLC (Mendocino Farms).  Appellant Michael Moreli (Moreli) is a settlement class member who objected to the proposed settlement and subsequently filed a motion to vacate the judgment.  He contends that we should reverse the judgment because the trial

1

court (1) failed to apply the correct legal standard when reviewing the settlement; (2) did not receive sufficient information about the maximum potential value of each claim to make an informed evaluation of the settlement; and (3) did not receive sufficient documentation to support its attorney fee award.

We conclude that Moreli has not met his burden to show the trial court failed to proceed in the manner required by law or otherwise abused its discretion in determining that the settlement was fair, adequate, and reasonable. Accordingly, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A. *The Lalor and Elias Complaints*

Defendant Mendocino Farms owns and operates a chain of fast-casual restaurants in California. At various times between 2018 and 2020, plaintiffs worked for Mendocino Farms as nonexempt employees.

In or about May 2020, plaintiff Lalor filed a putative wage and hour class action complaint against Mendocino Farms (Sacramento County case No. 34-2020-00277871) (the *Lalor* action).[1] Lalor generally alleged that Mendocino Farms failed to provide required meal and rest periods and, as a result, failed to maintain and provide accurate wage statements and pay all wages owed. Lalor's complaint alleged causes of action for (1) violation of California's unfair competition law (Bus. & Prof. Code, § 17200, et seq.); (2) failure to provide accurate itemized wage statements; (3) failure to pay minimum wages; (4) failure to provide required meal and rest periods; (5) waiting time penalties; (6) failure to pay overtime wages, and (7) failure to reimburse business expenses. Lalor later filed a first amended complaint adding plaintiffs Jemelle Jordan and Alexandria

---

[1] Although plaintiffs contend the *Lalor* complaint was submitted to the trial court's drop box in March 2020, the complaint was not filed until May 6, 2020. Plaintiffs' estimate of the defendant's maximum exposure is tied to the May 6, 2020 filing date.

Wheeler and a claim for civil penalties under the Labor Code Private Attorneys General Act of 2004 (Lab. Code, § 2698 et seq.)[2] (PAGA).

Around the same time, plaintiff Elias filed a separate wage and hour class action complaint against Mendocino Farms (Los Angeles County case No. 20STCV15652) (the *Elias* action). Elias alleged the same causes of action as Lalor, plus an additional claim for failure to maintain required records. Plaintiffs and their counsel subsequently agreed to coordinate their efforts and signed a joint prosecution agreement.

Mendocino Farms disputed plaintiffs' claims, arguing that class treatment was not appropriate and that it complied with all applicable wage and hour laws. Among other things, the company claimed that the putative class members were paid for all hours worked and were automatically paid premium wages for missed meal break periods. Mendocino Farms also claimed that many of the class members had signed mandatory arbitration agreements covering the class claims.

In June 2020, plaintiffs and Mendocino Farms (collectively, the Parties) agreed to mediate the *Lalor* and *Elias* actions before the Hon. Louis M. Meisinger (Ret.) a former superior court judge with extensive wage and hour class action and PAGA representative claim experience. Before the mediation, the Parties exchanged a significant amount of information through informal discovery. In addition to employment policies and related documents, Mendocino Farms produced data on the number of putative class members, a class list with hire and termination dates for the relevant four-year period, and payroll and timekeeping records for 2,292 individuals (or approximately 47 percent of the 4,928 putative class members), which represented 393,019 shifts, 50,024 pay periods and 95,310 workweeks. The payroll and timekeeping data included information about job titles, pay periods and workweeks, type of compensation paid (e.g., tips, overtime,

---

[2]     Undesignated section references are to the Labor Code.

regular wages), as well as hourly wage rates for the period from March/April 2016 through August 2020.

All told, Mendocino Farms produced 778,465 rows of data, which plaintiffs' counsel reviewed and analyzed. The Parties additionally conducted their own investigations and research, including interviews of putative class members, to ascertain whether Mendocino Farms's employment policies were understood and followed. The Parties also separately engaged experts to analyze the time and payroll data and prepare an estimate of Mendocino Farms's potential exposure.

B.    *Moreli's Complaints*

Like plaintiffs, plaintiff Moreli is a former employee of Mendocino Farms. He worked as an hourly, nonexempt "[m]anager in [t]raining" from May 2019 until March 2020.

In July 2020, after the Parties agreed to mediate the *Lalor* and *Elias* actions, Moreli filed a putative class action complaint and a separate representative PAGA complaint against Mendocino Farms (Los Angeles County case Nos. 20STCV27610 and 20STCV34641), alleging causes of action similar to those in the *Lalor* and *Elias* actions.

In November 2020, Moreli filed a motion to intervene in the *Lalor* action, which was denied. Moreli also filed a petition to coordinate his cases with the *Lalor* and *Elias* actions. The trial court granted the petition and assigned the coordinated cases to the Sacramento County Superior Court as the *Mendocino Farms Wage and Hour Cases*, JCCP No. 5153.

C.    *The Settlement Agreement*

On December 8, 2020, after more than eight hours of mediation with retired Judge Meisinger, the Parties agreed to the core terms of a settlement for the *Lalor* and *Elias* actions. A few months later, the Parties executed a joint stipulation of settlement agreement (the Settlement).

4

The Settlement provides for a class consisting of all nonexempt employees employed by Mendocino Farms in California at any time from March 18, 2016, to January 31, 2021, estimated to include 5,209 class members.  The Settlement provides for a (non-reversionary) gross settlement amount of $1,500,000.  From that amount, the Settlement provides that $75,000 is to be allocated to the PAGA claims; $10,000 to each class representative as a service award; approximately $50,000 to a settlement administrator; and (up to) $499,950.00 to class counsel for attorney's fees incurred in prosecuting the actions.  The remaining net settlement amount of approximately $834,000 is to be paid to the settlement class based upon the number of workweeks each participating class member worked in a nonexempt position during the relevant period.  The average payout to class members is expected to be approximately $160.

D.     *Court Approval of the Settlement*

In March 2021, plaintiffs filed a motion requesting conditional certification of the class and preliminary approval of the Settlement.  In support of the motion, plaintiffs submitted declarations describing what class counsel did to investigate the claims and why plaintiffs believed the Settlement was fair, adequate, and reasonable.

Plaintiffs estimated Mendocino Farms's maximum exposure at approximately $38,517,473, calculated as follows:  $11,419,946 for rest break violations (assuming one rest period violation per 3.5-hour shift), plus $2,304,388 for meal break violations (based on total unique meal period violations), plus $4,330,300 for wage statement penalties (based on 2,568 employees and 44,587 pay periods), plus $49,025 for unpaid overtime, plus $11,492,764 for waiting time penalties (based on 4,262 former employees), plus $260,450 for unreimbursed expenses (based on the estimated cost of $50 times the number of class members), for a total of $29,856,873 for the class claims; plus an additional $8,660,600 in PAGA penalties (based on 2,568 employees and 44,587 pay periods from May 6, 2019, to December 8, 2020).  After balancing the merits of the claims against the costs, risks, and delays of litigation, the uncertainties involved in

5

achieving class certification, the difficulties in establishing liability, the assertion that many of the claims are governed by an arbitration agreement, the trial court's discretion in reducing PAGA penalties, and the high likelihood of an appeal, plaintiffs concluded the proposed Settlement was fair, adequate, and reasonable.

Moreli objected to the motion for preliminary approval on the grounds plaintiffs had "dramatically undervalued" the maximum possible value of the claims and therefore settled the lawsuits too cheaply. Moreli argued that Mendocino Farms' true maximum exposure was in excess of $102 million.

The trial court preliminarily approved the Settlement, while granting Moreli's request for discovery of all non-privileged information previously provided to plaintiffs. Mendocino Farms subsequently provided Moreli with the payroll and timekeeping data and other information provided to class counsel.

After the trial court's preliminary approval, a notice of settlement was disseminated to the putative class members. Out of the 5,209 putative class members, there were six requests for exclusion and one objection—from Moreli.

In April 2022, plaintiffs filed their motion for final approval of the settlement. Plaintiffs argued that Moreli's objections to the Settlement lacked merit and that the trial court should approve the Settlement as fair, adequate, and reasonable.

In May 2022, Moreli filed a formal objection to the motion for final approval of the Settlement. As before, Moreli claimed that plaintiffs had underestimated the maximum potential value of the claims by more than $60 million.

Both plaintiffs and Mendocino Farms responded to Moreli's objections. After a hearing, the trial court issued a 14-page ruling rejecting Moreli's objections and granting final approval to the Settlement. The court found the parties' arguments "persuasive" and the Settlement, as a whole, to be fair, adequate, and reasonable. The court likewise approved the fee requests as reasonable and appropriate. The court subsequently entered a formal order and judgment granting final approval of the Settlement.

6

E. *Moreli's Motion to Vacate the Judgment*

Moreli filed a motion to vacate the judgment under Code of Civil Procedure section 663 on three grounds: (1) the trial court failed to apply the heightened standard required to approve a precertification class action settlement; (2) plaintiffs failed to properly value the claims being released and therefore underestimated the maximum value of the case by more than $60 million; and (3) plaintiffs failed to provide sufficient evidence to support the attorney fee award. Plaintiffs and Mendocino Farms opposed the motion. The trial court issued an order denying the motion to vacate on July 22, 2022. This appeal followed. Moreli challenges the order and judgment approving the settlement, as well as the order denying his postjudgment motion to vacate.

## DISCUSSION

### I

*Background Legal Principles*

A. *Class Action Settlements*

"A trial court must approve a class action settlement agreement and may do so only after determining it is fair, adequate, and reasonable. [Citation.]" (*In re Microsoft I-V Cases* (2006) 135 Cal.App.4th 706, 723.) The trial court is vested with "broad discretion" in making this determination. (*Ibid.*) In exercising its discretion, the court "should consider relevant factors, such as the strength of plaintiffs' case, the risk, expense, complexity and likely duration of further litigation, the risk of maintaining class action status through trial, the amount offered in settlement, the extent of discovery completed and the stage of the proceedings, the experience and views of counsel, the presence of a governmental participant, and the reaction of the class members to the proposed settlement." (*Dunk v. Ford Motor Co.* (1996) 48 Cal.App.4th 1794, 1801 (*Dunk*); accord, *Cho v. Seagate Technology Holdings, Inc.* (2009) 177 Cal.App.4th 734, 743.) The most important factor is the strength of the plaintiff's case, balanced against

the amount offered in settlement.  (*Kullar v. Foot Locker Retail, Inc.* (2008) 168 Cal.App.4th 116, 130 (*Kullar*).)

California law requires that class action settlements be scrutinized more carefully when they are settled before class certification proceedings.  (*Luckey v. Superior Court* (2014) 228 Cal.App.4th 81, 94; *In re Bluetooth Headset Products Liability Litigation* (9th Cir. 2011) 654 F.3d 935, 946.)  This more exacting review is warranted to ensure that class representatives and their counsel have not allowed self-interest to infect the negotiations.  (*Bluetooth,* at p. 947.)

At the same time, because public policy generally favors the settlement of complex class action lawsuits, "[d]ue regard should be given to what is otherwise a private consensual agreement between the parties."  (*Dunk, supra*, 48 Cal.App.4th at p. 1801; *Microsoft I-V Cases, supra*, 135 Cal.App.4th at p. 723.)  Accordingly, even bearing in mind the need for heightened scrutiny, "precertification settlements are not necessarily flawed and in fact are routinely approved if found to be fair and reasonable." (*Wershba v. Apple Computer, Inc.* (2001) 91 Cal.App.4th 224, 248 (*Wershba*), disapproved on other grounds by *Hernandez v. Restoration Hardware, Inc.* (2018) 4 Cal.5th 260, 269-270; accord, *Cho v. Seagate Technology Holdings, supra*, 177 Cal.App.4th at p. 743.)

The burden is on the proponent to demonstrate that a proposed settlement is fair, adequate, and reasonable.  (*Wershba, supra*, 91 Cal.App.4th at p. 245.)  However, a presumption of fairness exists when:  " '(1) the settlement is reached through arm's-length bargaining; (2) investigation and discovery are sufficient to allow counsel and the court to act intelligently; (3) counsel is experienced in similar litigation; and (4) the percentage of objectors is small.  [Citation.]' "  (*Ibid*.)  The objector bears the burden to rebut that presumption.  (*Carter v. City of Los Angeles* (2014) 224 Cal.App.4th 808, 820; accord, *Dunk, supra*, 48 Cal.App.4th at p. 1800; *7-Eleven Owners for Fair Franchising v. Southland Corp*. (2000) 85 Cal.App.4th 1135, 1165-1166 (*7-Eleven*).)

8

Our review of the trial court's approval of a settlement is limited. We do not reweigh the evidence or make an independent determination of whether the terms of the settlement are fair, adequate, and reasonable. (*Nordstrom Com. Cases* (2010) 186 Cal.App.4th 576, 581.) We instead examine only whether there is a strong showing of a clear abuse of discretion by the trial court in approving the settlement. (*Ibid.*)

B.    *PAGA Settlements*

"The Legislature enacted PAGA almost two decades ago in response to widespread violations of the Labor Code and significant underenforcement of those laws. [Citations.] Before PAGA's enactment, tools for enforcing the Labor Code were limited. Some statutes allowed employees to sue their employers for damages resulting from Labor Code violations such as unpaid wages. [Citations.] Other Labor Code violations were punishable only as criminal misdemeanors, which local prosecutors tended not to prioritize. [Citation.] Additionally, several statutes provided civil penalties for Labor Code violations, but only state labor law enforcement agencies could bring an action for civil penalties and those agencies lacked sufficient enforcement resources. [Citations.]" (*Adolph v. Uber Technologies, Inc.* 14 Cal.5th 1104, 1116 (*Adolph*).) PAGA addressed these problems by creating civil penalties for most Labor Code violations and by empowering " 'aggrieved employees' " to sue on behalf of themselves and other employees to recover those penalties. (*Adolph, supra*, at p. 1116; *Arias v. Superior Court* (2009) 46 Cal.4th 969, 980.)

A PAGA claim is " 'legally and conceptually different' " from an employee's individual claim for damages and statutory penalties. (*Moniz v. Adecco USA, Inc.* (2021) 72 Cal.App.5th 56, 74.) An aggrieved employee suing under PAGA does so as the proxy or agent of the state, acting as private attorneys general, to recover civil penalties that otherwise would have been assessed and collected by the state's labor law enforcement agencies. (*Ibid.*) A PAGA representative action is therefore " ' "fundamentally a law enforcement action" ' " and relief is ' "designed to protect the public [rather than] benefit

9

private parties." ' " (*Ibid.*)  If an employee successfully recovers an award of civil penalties, PAGA requires that 75 percent of the recovery be paid to the Labor and Workforce Development Agency, leaving only twenty-five percent for the aggrieved employees.  (*Adolph, supra*, 14 Cal.5th  at p. 1116; § 2699, subd. (i).)

PAGA claims are subject to a one-year statute of limitations.  (Code Civ. Proc., § 340, subd. (a).)  The Labor and Workforce Development Agency must be provided with notice of any proposed settlement,[3] and any final settlement requires review and approval by the trial court.  (§ 2699, subd. (*l*)(2).)

Although PAGA itself does not provide a standard for the trial court's review, caselaw establishes that trial courts should review a PAGA settlement to ascertain whether it is fair, reasonable, and adequate in view of PAGA's purposes and policies. (*Moniz v. Adecco USA, Inc., supra*, 72 Cal.App.5th at p. 77.)  The trial court's approval of a PAGA settlement is reviewed for abuse of discretion.  (*Id.* at p. 78.)

II

*Moreli's Arguments*

Moreli argues, as he did in his motion to vacate, that the trial court erred in approving the Settlement because the court (1) failed to apply the heightened scrutiny required when reviewing a precertification class action settlement; (2) lacked sufficient information about the potential value of the claims to make an informed evaluation of the proposed settlement; and (3) lacked the documentation necessary to determine a reasonable attorney fee award.  We find no abuse of discretion.

---

[3]     Plaintiffs sent the executed Settlement agreement to the Labor and Workforce Development Agency on February 28, 2021.

10

A.    *Failure to Apply the Heightened Scrutiny*

As a threshold issue, we reject Moreli's contention that the trial court erred by failing to apply the heightened scrutiny required for settlements reached before class certification.

Moreli argues that because the trial court did not expressly state that it applied heightened scrutiny, we must presume it did not. Controlling legal principles dictates the opposite result. In the absence of contrary evidence, we must presume that judicial duties were properly performed and that the trial court followed the law. (*In re Marriage of Winternitz* (2015) 235 Cal.App.4th 644, 653-654; *Ross v. Superior Court of Sacramento County* (1977) 19 Cal.3d 899, 913-914; *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) We find no reason to depart from that presumption here. The trial court's lengthy order shows that it carefully analyzed the evidence, including Moreli's own evidence and arguments, before approving the Settlement. Moreli, in contrast, cites nothing to support his contention that the court failed to apply the required level of scrutiny. Accordingly, we reject Moreli's claim that the court failed to apply the correct standard in approving the Settlement.

B.    *Sufficiency of the Record*

Moreli next contends that the trial court was not sufficiently informed of the value of plaintiffs' claims to intelligently evaluate the Settlement. In particular, he claims that the plaintiffs failed to properly estimate the maximum potential value of each claim released in the Settlement, thereby understating Mendocino Farms' total exposure in the case by more than $60 million. As a result, he contends the court lacked a sufficient understanding of the amount in controversy to assess the reasonableness, adequacy, and fairness of the Settlement. We disagree.

We begin with some general observations about what the law requires—and what it does not—when a trial court reviews a proposed class action settlement involving PAGA claims.

11

First, we reject Moreli's contention that the law requires the trial court to evaluate the fairness of a settlement on a claim-by-claim basis. It is the settlement as a whole, not just its constituent parts, that must be examined for fairness. (*Dunk, supra*, 48 Cal.App.4th at p. 1801; *Lane v. Facebook, Inc.* (9th Cir. 2012) 696 F.3d 811, 823.)

Second, we reject Moreli's contention that the law requires evidence of the theoretical "maximum value of each claim" released in the settlement. Moreli's reliance on *Kullar, supra*, 168 Cal.App.4th 116 is misplaced. *Kullar* does not "require the record in all cases to contain evidence in the form of an explicit statement of the maximum amount the plaintiff class could recover if it prevailed on all its claims." (*Munoz v. BCI Coca-Cola Bottling Co. of Los Angeles* (2010) 186 Cal.App.4th 399, 409 (*Munoz*).) It only requires a record that is sufficiently developed to allow the court to understand the amount in controversy and the realistic range of outcomes of the litigation. (*Ibid.*) Thus, while a court must receive basic information about the nature and magnitude of the claims in question, and the basis for concluding that the consideration being paid for the release of those claims is reasonable, the court need not determine the maximum potential recovery for each released claim. (See *Lane v. Facebook, Inc., supra*, 696 F.3d at p. 823.) A proposed settlement is not to be judged against a hypothetical or speculative measure of the maximum amount the plaintiffs could have obtained at trial, but whether the settlement is "within the 'ballpark' of reasonableness" under all the circumstances. (*Wershba, supra*, 91 Cal.App.4th at pp. 246, 250; *Kullar,* at p. 133; *Chavez v. Netflix, Inc*. (2008) 162 Cal.App.4th 43, 55.) Starting with the absolute maximum value of a case and discounting from that amount based on the risks of litigation is certainly one way to arrive at a realistic understanding of the amount in controversy, but it is not the only way.

Third, although the moving parties have the burden to show that a proposed settlement is fair and reasonable, "in the final analysis it is the court that bears the responsibility to ensure that the recovery represents a reasonable compromise . . . ." (*Kullar, supra*, 168 Cal.App.4th at p. 129.) While the trial court should not give a

12

rubber-stamp approval, the settlement hearing also should not be turned into a trial or rehearsal for trial on the merits. (*7-Eleven, supra*, 85 Cal.App.4th at p. 1145; accord, *Wershba, supra*, 91 Cal.App.4th at p. 246.) " 'Neither the trial court nor this court is to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements.' [Citation.]" (*7-Eleven,* at p. 1145.)

Fourth, when reviewing a settlement in a lawsuit that includes both class claims and PAGA penalties, the trial court may apply a sliding scale in determining whether the PAGA settlement is reasonable. For example, where there is a robust settlement of class claims, settlement of the PAGA claims may be substantially reduced below their standalone settlement value. (See, e.g., *Stoddart v. Express Servs.* (E.D.Cal., Oct. 6, 2020, No. 2:12-cv-01054-KJM-CKD) 2020 U.S.Dist. LEXIS 186315, at pp. *43-44; *Slavkov v. Fast Water Heater Partners I, LP* (N.D.Cal., July 25, 2017, No. 14-cv-04324-JST) 2017 U.S.Dist. LEXIS 116303, at p. *5; *Swain v. Anders Grp., LLC* (E.D.Cal., Apr. 17, 2023, No. 1:21-cv-00197-SKO) 2023 U.S.Dist. LEXIS 67162, at pp. *19-20.)

Applying these principles, we reject Moreli's claim that the trial court lacked sufficient information about the nature and magnitude of plaintiffs' claims to evaluate the fairness of the Settlement. The information before the court included declarations from experienced class counsel describing how counsel investigated the merits of the class claims and potential damages through informal discovery and exchange of documents with the defendant. Specifically, the record shows that Mendocino Farms provided plaintiffs with data on the number of putative class members, a class list with hire and termination dates, relevant wage and hour policies, and several years' worth of payroll and timekeeping records. The combined data sample amounted to nearly three-quarters of a million lines of data, and represented more than 393,000 shifts, 50,000 pay periods, and 95,000 workweeks. In addition, plaintiffs retained an expert to review the time and

payroll data and prepare an analysis of meal and rest break violations, premium wages paid and owed, unpaid wages, interest, and penalties. Plaintiffs also engaged in extensive negotiations and participated in a private, arm's-length mediation with Mendocino Farms before a mediator experienced in the legal issues before him.

Based on their investigation, plaintiffs determined that "a generous likely total exposure for the asserted claims" is approximately $38.5 million. Plaintiffs described how they arrived at the estimate. They explained that the assigned value for meal break claims, about $2.3 million, was based on a calculated total of unique meal period violations, multiplied by average pay rates. The assigned value for rest break claims, about $10.3 million, was based on the assumption of one rest period violation per shift over 3.5 hours, multiplied by average pay rates. The assigned value for wage statement violations, about $4.3 million, was calculated based on 2,568 employees and 44,587 pay periods. The assigned value for waiting time penalties, about $11.5 million, was calculated based on 4,262 former employees. The assigned value for unreimbursed business expenses, less than $300,000, was based on an assumed cost of $50 per cell phone multiplied by 5,209 class members. The assigned value for PAGA penalties was approximately $8.7 million (also based on 2,568 employees and 44,587 pay periods). Plaintiffs explained that their investigations did not reveal significant issues with respect to unpaid overtime or off-the-clock claims.

While acknowledging that the maximum potential exposure could exceed $38 million, plaintiffs asserted that $38 million was believed to be the "likely maximum recovery if Plaintiffs and the class were to prevail at trial on all claims." After taking account of the costs and risks of litigation, such as class certification, the possibility of arbitration, proving liability at trial, and the possibility that an award of civil penalties would be reduced by the court, plaintiffs determined that the proposed gross settlement amount of $1.5 million was fair and reasonable.

To be sure, plaintiffs' showing was not perfect. Plaintiffs could have done more to explain how they valued the PAGA penalties and why they determined the overtime claims had little or no value. However, the trial court was not limited to the information presented by plaintiffs in support of their motion. The court also was able to consider Moreli's opposition, and the responses to that opposition.

Using essentially the same data as plaintiffs, Moreli prepared and submitted his own valuation analysis in support of his opposition. According to Moreli, his valuation showed that plaintiffs underestimated the maximum value of the class claims by more than $5 million and the maximum value of the PAGA penalties by more than $70 million.

Moreli explained how he arrived at his estimates and why he believed plaintiffs' valuations were too low. Specifically, he argued that plaintiffs: (1) ignored penalties for wage statement violations available under section 226.3; (2) improperly released section 226.3 penalties for no value; (3) failed to include additional penalties for recurring violations under section 210; (4) wrongly assumed that multiple PAGA penalties cannot be imposed ("stacked") for the same underlying conduct; (5) wrongly assumed that heightened PAGA penalties for a "subsequent" violation cannot be imposed without notice of the prior violation; (6) improperly assumed certain PAGA penalties had no value; (7) failed to include the cost of cell phone service in valuing the expense reimbursement claim; (8) underestimated meal and rest break claims by at least $1 million; and (9) failed to assign any value to off-the-clock (and related minimum wage) claims related to meal breaks.

In response, the settling Parties explained why they believed Moreli's evidence and arguments did not show the Settlement was unfair, inadequate, or unreasonable. To begin, plaintiffs argued that "his valuations of the most valuable claims—rest break, meal break, unpaid overtime, waiting time penalties, statutory wage statement penalty—are either remarkably similar or identical" to plaintiffs' estimates, with the primary differences attributable to interest calculations and an additional two months of

15

extrapolated damages. The settling Parties also disagreed that the reimbursement claim should include the full cost of cell phone service since Mendocino Farms did not require employees to use their personal cell phones for business purposes and had a policy prohibiting employees from using personal devices except on breaks.

The Parties further disputed the claim that they ignored significant off-the-clock (and minimum wage) claims. The Parties pointed to evidence in the record showing that hourly managers "did not clock out" for meal periods during their shifts and therefore generally did not work off-the-clock. Thus, they asserted, the realistic exposure for such claims was likely "very modest," less than $150,000, and would not render the Settlement unreasonable.

As to the PAGA penalties, the Parties cited legal authority showing that it is not improper to release all known and unknown claims that were or could have been pled based on the allegations of the complaint (see, e.g., *Villacres v. ABM Industries Inc.* (2010) 189 Cal.App.4th 562, 586-587; *Carter v. City of Los Angeles, supra*, 224 Cal.App.4th at pp. 820-821), and that an employer generally cannot be subject to heightened PAGA penalties for "subsequent" (recurring) violations unless it received notice of the prior violation (*Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1209; *Bernstein v. Virgin Am., Inc.* (9th Cir. 2021) 3 F.4th 1127, 1144; *Trang v. Turbine Engine Components Technologies Corp.* (C.D. Cal., Dec. 19, 2012, No. CV 12-07658 DDP RZX) 2012 WL 6618854, at p. *5.)

They also showed that it is (at best) legally uncertain whether PAGA penalties may be recovered under section 226.3 for inaccurate wage statements,[4] and whether

---

[4] Compare *Gunther v. Alaska Airlines, Inc.* (2021) 72 Cal.App.5th 334, with *Raines v. Coastal Pacific Food Distributors, Inc.* (2018) 23 Cal.App.5th 667. (See also *Lopez v. Friant & Associates, LLC* (2017) 15 Cal.App.5th 773, 784, fn. 6.

16

multiple PAGA penalties may be recovered for the same underlying conduct.[5]  Plaintiffs further explained that calculating exposure for a PAGA claim is inherently speculative because courts have discretion to reduce PAGA penalties where an award would be unjust or oppressive.  (§ 2699, subd. (e)(2); see also § 226.3)

The trial court was able to consider Moreli's evidence and arguments, and the settling Parties' responses to it, before approving the Settlement.  In our view, this information, together with the other evidence presented in support of the motion, was sufficient for the court to make an informed evaluation of the Settlement.

*Kullar, supra*, 168 Cal.App.4th 116, which Moreli relies upon, is distinguishable.  In *Kullar*, there was "nothing" before the court to establish the sufficiency of the investigation other than an assurance from class counsel that "they had seen what they needed to see."  (*Id*. at pp. 126, 129; *Munoz, supra*, 186 Cal.App.4th at p. 410.)  The court did not receive even basic information about the nature and magnitude of the claims in question and the basis for concluding that the consideration received for the release of the claims was reasonable.  (*Kullar,* at pp. 129, 133.)  Here, in contrast, the record contains ample information from which the court could evaluate whether the Settlement was fair, adequate, and reasonable.

---

[5]     Compare *Snow v. United Parcel Service, Inc.* (C.D. Cal., Apr. 1, 2020, No. EDCV20025PSGAFMX) 2020 WL 1638250, at pp. *3-4; *Smith v. Lux Retail North America, Inc.* (N.D. Cal., June 13, 2013, No. C 13-01579 WHA) 2013 WL 2932243, at p. *3; and *Posephny v. AMN Healthcare Inc.* (N.D. Cal., July 9, 2020, No. 18-CV-06284-KAW) 2020 WL 13612298, at p. *3; with *Schiller v. David's Bridal, Inc.* (E.D. Cal., July 14, 2010, No. 1:10-CV-00616 AWI) 2010 WL 2793650, at p. *6 [it is conceivable that plaintiff could stack PAGA penalties for each violation]; *Salazar v. PODS Enterprises, LLC* (C.D. Cal., May 8, 2019, No. EDCV19260MWFKKX) 2019 WL 2023726, at p. *6 [holding that it is possible "although highly unlikely" plaintiff could stack PAGA penalties for each violation]; and *Steenhuyse v. UBS Financial Services, Inc.* (N.D. Cal. 2018) 317 F.Supp.3d 1062, 1070 [allowing stacking].

We acknowledge Moreli's concern that class counsel took an overly pessimistic view of the maximum value of the PAGA penalties. However, we must be mindful of the limited scope of our review. We reiterate that our role is not to make an independent determination whether the terms of the Settlement are fair, adequate, and reasonable. (*Munoz, supra*, 186 Cal.App.4th at p. 407.) Nor should we reach any dispositive conclusions on the unsettled issues of fact and law underlying the merits of the dispute. (*7-Eleven*, *supra*, 85 Cal.App.4th at p. 1146; *Wershba*, *supra*, 91 Cal.App.4th at p. 246.) We only determine whether the trial judge, whose views are entitled to great weight, acted within the scope of his or her broad discretion.[6] (*Munoz*, at p. 410.)

We see no basis for finding an abuse of discretion here. The record before the court established that the Settlement was entitled to a presumption of fairness, and Moreli failed to adequately rebut that presumption.

On appeal, Moreli asserts the same basic argument that he raised below, i.e., that plaintiffs underestimated the maximum potential value of the claims and therefore settled too cheaply. However, as plaintiffs showed, the assumptions underlying his valuation are either contrary to law or rest on unresolved legal and factual issues that are fraught with risk and uncertainty.

In sum, the trial court was informed of the differing valuations and the reasons why they differed. The court carefully considered the arguments and weighed the evidence before it and determined that Moreli's objections were not a basis for rejecting the agreement. Nothing Moreli argues on appeal has convinced us that this was an abuse of discretion. We find that the trial court understood the amount in controversy and the

---

**6** Although not dispositive, we note again that plaintiffs sent the executed Settlement agreement to the PAGA unit in the Labor and Workforce Development Agency and the agency did not object to its terms. (See *Turrieta v. Lyft, Inc.* (2021) 69 Cal.App.5th 955, 973 ["the [Labor and Workforce Development Agency] may provide the trial court with comments on or objections to a proposed settlement, and has done so in the past"], review granted Jan. 5, 2022, S271721.)

18

realistic range of outcomes in the litigation.  We are not persuaded the trial court misapplied the law by rejecting Moreli's differing opinions.  Accordingly, even bearing in mind the heightened scrutiny that applies to precertification settlements, we conclude the trial court did not abuse its discretion in approving the Settlement.

C.    *Approval of the Fee Award*

As part of the Settlement, the Parties agreed that no more than one-third of the gross settlement amount would be paid to class counsel as attorney fees.  After hearing Moreli's objections to the Settlement, the trial court approved the maximum fee award of $499,950, representing one-third of the common fund.  Moreli challenges the fee award, arguing the court erred by using a percentage-of-recovery method without requiring detailed time sheets and performing a "lodestar for fees as a cross-check."

We review an attorney fee award under an abuse of discretion standard.  (*Laffitte v. Robert Half Internat. Inc.* (2016) 1 Cal.5th 480, 488 (*Laffitte*).)  We find no abuse here.

There are two primary methods of determining a reasonable attorney fee in the context of class action litigation.  (*Laffitte, supra*, 1 Cal.5th at p. 489.)  The percentage-of-recovery method calculates the fee as a percentage of a common fund recovered on behalf of the class.  (*Ibid*.)  The lodestar method calculates the fee by multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate, which amount then may be adjusted based on other factors.  (*Ibid*.)

In *Laffitte*, the Supreme Court held that trial courts have the discretion to choose between the two fee calculation methods.  (*Laffitte, supra*, 1 Cal.5th at p. 504.)  An objecting class member in that case argued that courts should not be permitted to use the percentage-of-recovery method and that fee awards should be calculated only under the lodestar method.  (*Id*. at p. 486.)  The court disagreed, holding that it is not an abuse of discretion to use the percentage method to calculate a fee in a common fund case.  (*Id*. at p. 503.)

19

The court further held that trial courts have the discretion to blend the two fee calculation methods, using one method to "cross-check" the reasonableness of the other's result. (*Laffitte, supra*, 1 Cal.5th at pp. 496, 506.) Thus, when percentage-of-recovery is used as the primary fee calculation method, trial courts have the discretion to "cross-check" the reasonableness of that fee through a lodestar calculation. (*Id*. at pp. 488, 496, 504.) But the Supreme Court was clear that a lodestar cross-check is not required: Trial courts "also retain the discretion to forgo a lodestar cross-check and use other means to evaluate the reasonableness of a requested percentage fee." (*Id*. at p. 506.)

In this case, the trial court elected not to perform a lodestar cross-check. Instead, it used other means to satisfy itself that the requested fee was reasonable, including a comparison of the requested fee to the " 'going rate' " for counsel in similar actions. The methodology employed by the trial court is consistent with *Laffitte* and the resulting percentage fee award is consistent with awards in other cases. (*Laffitte, supra*, 1 Cal.5th at pp. 485-486 [approving a one-third attorney fee award]; *Chavez v. Netflix, Inc., supra*, 162 Cal.App.4th at p. 66, fn. 11 [noting that fee awards average around one-third of the recovery]; *In re Activision Sec. Litigation* (N.D.Cal. 1989) 723 F.Supp. 1373, 1378 [the benchmark is at approximately 30 percent].) We therefore conclude the trial court did not abuse its discretion in approving the fee award.

DISPOSITION

The order and judgment approving the Settlement, and the postjudgment order denying the motion to vacate, are affirmed. The respondents shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a) (1) & (2).)


_____\\s\\_____,
Krause, J.


We concur:


_____\\s\\_____,
Duarte, Acting P. J.


_____\\s\\_____,
Boulware Eurie, J.


21